A is Hicks v. Gregory Middleton. Alright, we'll hear first from Mr. Ramachandrappa, and if I've mispronounced that, please don't hesitate to tell me the correct pronunciation. May it please the court, I'm Naveen Ramachandrappa on behalf of the plaintiffs, Richard and Jocelyn Hicks. In our briefs, we made two arguments for reversal. The first is that Middleton's commute had ended once he was inside the Port of Savannah, and second, regardless of when the commute ended, Middleton was within the scope of his employment because he was getting Ports America's game plans at the time of the collision. I want to focus on the second argument, and that's because the Georgia Supreme Court's opinion in Prodigy's Child Care v. Cotton has largely simplified a lot of this analysis, and that opinion came out after our briefing was completed. So here's the important part of Prodigy's. The court said that, quote, when the employee who is traveling to or from work does something else that is allegedly within the scope, that contention is not properly assessed by asking if that separate act fits within a small set of specific factors. The proper test is the traditional respondent superior test, which is furtherance and scope of employment. Now in this case, the something else and that separate act beyond any commute was Mr. Middleton going to get Ports America's game plan, and that is within the scope and furtherance of Ports America's business. Can I ask you a quick question that I just don't think I fully understand from either of the briefs in this case? Who is it that prescribes the three pre-work things, the game plan, the PPE, and the safety briefing? Is that, does Ports America prescribe that, or is that sort of like part of the common law of the port? Do all employers, is that just sort of something that's done? No, that's Ports America. I mean, we can see that from the 30B6 deposition of Mr. Wills. He says, quote, that's his whole job. He gets the paperwork. He knows the layout of the hatch. And then we ask him, you know, is that all, rather than him learning all that stuff on the fly, it behooves the doctor to have an understanding of that so we can properly prepare. Answer, that's true. So that comes from Ports America. And if he were working for some other employer, would they, they might have a completely different, I was going to say game plan, but that. Certainly. And Ports America could change the way that they do things today. Is that in fact how it works in the port of, this is Savannah, right? Is that in fact how it works in the port of Savannah? If you're working for some different employer, your pre-work routine might be just completely different. No game plan, no PPE, no, you know, sort of ship side briefing. It's just completely different. That's right. For those three things, I suspect, well, there are some collectively bargained for requirements. I can't imagine you could, for example, get rid of like safety equipment. But in terms of the game plans, for sure, they could change that. For example, Ports America could have today, they could say, we're not going to require our employees to drive around the port to go get the game plans, we're just going to have them at the ship. They'll be on a tablet, they'll be printed out. And if they had done that, then this case wouldn't be here because it wouldn't be within, A, he wouldn't have been driving around, but B, it wouldn't be within the scope. But having made that choice, having chosen to say, this is part of one of your job requirements, then they're liable for what happens if he does something within that scope that ends up being negligent. Now the other side, in response to these sort of facts about these are your pre-ship duties before 1 o'clock, they say, well, we don't start paying them until 1 o'clock. And we just know, under the Georgia law, that that's just not the requirement for respite superior. This is Cloe White versus Lattimore, Pilgrim had used his cell phone to contact his employer even though he was not on the clock, and the court said that that was still a question of fact. Smith versus CSX Transportation, activities within the scope include those that are necessarily incidental to the employment, even if the employee is off-duty. And then one more case, Housing Authority versus City of Cartersville versus Jackson, payment of money may be corroborative, but it's not itself inclusive. Well, it's interesting, and your response to Judge Newsom, because initially I was thinking that maybe the commute ends when you get to the port, but if I understand your response to Judge Newsom, that won't work because there are people who are inside the port that have different situations, some who don't have to go and get this PPE and other things. And so, arguably, we do need to narrow when the commute ended. And so just to be clear, when are you saying the commute would have ended, or what's your position? Sure. To start, I would say, don't have to reach that question. We can say in this case because he's getting the game plans, that's enough. But I would say that, so putting aside those facts, I'm just going to say more generally, I would say that the commute, once he gets to the port, has ended. I agree with that. What I was saying in response to Judge Newsom's questions is that, could Ports of America change some of those duties? For example, could they say, you don't have to get the game plans before you get to the ship? Yes, they could change that. But it still wouldn't change the fact that once you're inside the port, you have to be there on some kind of business for Ports of America or one of the other Stevedore. But isn't the, or one of the other Stevedore operations, isn't that important? I mean, like, the employer that you're seeking to put on the hook here is Ports of America, and if Ports of America prescribes its particular three-step pre-work routine, then why isn't he, he hadn't picked up the game plan yet, so why isn't he still, to Judge Abudu's point, commuting to begin the scope of his employment with Ports of America? Well, getting the, so it's not just having the game plan that's part of the pre-required set of duties, it's getting the game plan. The game plan is located in a dock house that's away from the ship. So actually going to get it, that's part of the job duties. It's not just having it, it's actually going to get it. And that's why the sort of hypothetical that I had offered, that if Ports of America said, no, no, we're just going to bring those game plans to the ship, that would take away one of his duties. He no longer has to go get it. So that's why, as soon as he has the obligation of going to get the game plans, which is what he's doing, that's within the scope, that's, his work has already started. Just to sort of ask you a, maybe a basic question. It seems like under Cotton, you know, the courts have said that whether an employee was acting in furtherance of the employer's business and within the scope of her employment is generally a question for the jury. And so I guess, I guess my question for you is, is there any reason why this wouldn't be a jury question? No. And in fact, the four justice concurrence written by Justice Peterson says that almost any time that this contention that there's some mid commute work related activity that's going on almost always be a question for the jury. And we certainly have that here, including because we have the evidence both from Middleton himself from Courts of America's 30B-6, that we've got these three steps that you have to do before you start going. And one of those steps is actually going to get the game plans, not just having them, but actually the drive to that. So yes, it's certainly a jury question. And I think that sort of prefaces everything, including whether it mattered that he wasn't on the clock and wasn't getting paid, as well as whether he was an employee, which is another argument. I mean, of course, let's say he was coming from Florida to Savannah for some reason. And the accident happened in Florida. Then we could say it wasn't a jury question, right? And the same facts as we have here, because there's nothing in the record that indicates before he got to the Union Hall or whatever, that he was going to be working for Ports of America, right? That's right. Yeah. I mean, if there's just not under any other summary judgment standard, if there's absolutely no evidence that would allow a jury to reach a conclusion that they're within the scope, then yes, that's a question of law. But in facts like this, I mean, even the facts of Cotton, the person wasn't actually on the phone. So to use the example that Judge Newsom was giving about sort of going to get the game plans versus actually having them. And Cotton, the buoy, the woman who was the employee at issue, she was scrolling through her contacts to find her work contact to say, hey, I'm going to be late. And before she actually hit it, she hit somebody else. She hit a car. And I mean, that question is going back to the Court of Appeals, but what the Supreme Court suggested is those types of questions, we don't look at specific factors. We just look at whether there is something in the scope of employment and the furtherance of business. And we have those two factors here. The scope, it was part of his job to go get the game plans, and then furtherance of the business. We have all the testimony about how when you're unloading these ships, these massive ships that have to be done in a very specific way, and you've got to do everything, you know, to the second in order to be most efficient, you've got to have the game plans, and you've got to know them. And that all furthers Forged in America's business. I'm going to save the remainder of my time for rebuttal, unless there are any other questions. All right. Thank you, counsel. We'll hear next from Mr. Freed. Good morning, your honors. May it please the court. Michael Freed on behalf of the appellee, Ports America. The issue here is what can Ports America be vicariously liable for Mr. Middleton's actions when the undisputed facts show that he was merely driving on his way to report ready for work, and had not completed a single task for Ports America distinct from his commute at the time he struck Mr. Hicks? Well-established principles of Georgia law say the answer to that question is no. What in response to your adversary's argument in response to my question, about the fact that part of the three-step process is going to get the game plan, not just having the game plan. Because I get it. I mean, frankly, I was sort of, and maybe still am, sort of enamored of the bright line that we can just say, look, until he got the game plan, that's not within the scope. But what about the point that, well, the scope is to go get the game plan? I think going to get, by definition, means he was still traveling. He was still driving to complete some task in furtherance of Ports America's business or in the course and scope of his employment. And until he does one of those tasks, at a minimum, I think that's the first place the line can be drawn, is the first time he completes a task in furtherance of Ports America's business or in the course and scope of his employment that is distinct from his commute. I agree with my opponent that under Cotton, Cotton and other cases require that there be something more, something other than the drive, other than the commute itself. What if the facts were just a little bit different and immediately when he left the Union Hall, there was a Ports America guy in his yellow jacket or something outside the Union Hall who said, all right, first thing for you, go get the game plan. Now he's driving to get the game plan. Does that completely change things? I don't think it does. And I'll tell you a couple of reasons why. First of all, there was nothing uncustomary or unusual about what he was required to do that day. I mean, this is standard routine stuff. At the time he left the Union Hall, he knew what he had to do to be ready to work. You know, it's the three things. It's the game plan, the PPE, the safety meeting. My first question, is that because that's Ports America's routine or is that the common law of the port? Yeah, so I don't believe there's anything in the record that establishes that that is a Ports America requirement. It's admittedly a little fuzzy and some of these things are in the collective bargaining agreement that all the stevedore companies are party to through the association. Do you see why it might matter? Maybe it's just me, if I'm sort of hung up on where it is that we can draw this line that the scope begins. But if Ports America has prescribed those duties itself, then it's sort of like he walks out of the Union Hall, sees the guy in the yellow jacket. The guy in the yellow jacket says, commence your three-step process, go get the game plan. Like, it's just minus the guy. I still think the important factor here, Your Honor, is that he's still driving to show up for work and to complete the tasks that he's required to do. He's still commuting and the undisputed facts show that he never completed any of them. Well, it is undisputed that unless you have work to do, you're not even allowed to enter into the port. So why doesn't the commute end when he arrives at the port? Because the requirements that he is, the tasks he is required to fulfill are the same before he enters the port and after he enters the port. Nothing changes about the course and scope of his employment at the time he goes through the gate of the port. He's still required to show up at berth four, where his ship was, having gotten the game plan, PPE, safety meeting, and time. But I'm still, I'm stuck perhaps on, he's not even allowed to be in the port unless he has business there. Right. But that does not mean that the course and scope of his employment begins at the time he enters the port. But doesn't he have to, I mean, if he can't show that he's employed by someone, can he get into the court? I don't believe, I don't believe he can. And to be clear, his employment and acting in the course and scope of his employment are two different things. I understand that. But let me ask you something else. Did he or did he not, did Ports America require him to take a drug test after this accident occurred? I believe, Your Honor, if I'm not mistaken, that is part, that's a requirement under the CBA. Technically, you know, Ports America is kind of a party to the CBA through the association. But if Ports America required him to take a drug test, that would be something they could do only if they were employing him, right? I don't know the answer to that. Why doesn't this present a jury question? It does not present a jury question because the undisputed facts here show that he had not completed a single task in furtherance of Ports America's business or in the course and scope. And that's undisputed. So what we have here is, you know, Well, the first task is he has to show up and be at the port. Isn't that, I mean, that's, that's kind of, it appears, and this may really be a question for a jury, but he can't even, he's not even supposed to be there unless he has business there. And once he gets there, he's only there to advance Ports America's business. Well, here's one of the things that the district court looked at in response to that, in response to the question that you're asking Judge Abudo. Mr. Middleton testified that, you know, the only thing I need to do is show up ready for work at one o'clock. There's nothing preventing me from leaving and coming back. I'm not, I'm not on lockdown. And his own actions show that he was free to do what he wanted once he got there, because he did not go directly to berth four where his ship was located. Instead, he drove all the way down to the end of the port a mile away. Jury question, right? I mean, he has a different story for why he did that. He says he was looking for the instructions or the game plan. And why doesn't that present a jury question? So I think that we can credit his testimony and make the inference in his favor. And even when we do that, the fact remains that he was still on his way to do those things. He was still commuting to do those things, and he still had not completed any of those things. Just so I understand, why is completion of the first task, why is that the magic moment? Because up until that point, he's still driving on his way to work. He's still in commute on his way to work, and on his way to complete the task that he's required to do. And I will concede, and I agree. Had he completed one of them, had he gotten to the dock house, got the game plan, got back in his truck, drove further, hadn't completed any other of those tasks, I think that would probably be enough to make a fact question for the jury. But here, he didn't do any of those things. He was still in route. I equate it to this. I've been trying to think of some analogies that would be helpful. I used to work at a law firm that had a secured parking deck. And you couldn't get into the parking deck unless you had a card. So if I drive to work one day, going to fulfill my employer's business, I scan my card, I drive into the parking deck, and I hit somebody in the parking deck. I am not in the course and scope of my employment simply because I went through that gate. I'm still driving. I haven't parked. I haven't gotten out of my vehicle. I hadn't done anything yet in furtherance of my employer's business. It's the same scenario here. You, the scenario you just described, you have options. You can go across the street. You can walk. You can bicycle. In this case, it does seem like in order for him to be employed, and to begin his work, he had to at least be at the port. He did. He did. And I would still have to be in my office building. And the fact that I have options, I'm not quite seeing how that changes the scenario. I thought you were equating the port to your parking garage. I was equating the fact that I would be driving in a restricted area on the property where I'm reporting to work. That's the analogy I was trying to make there. And I don't believe in that scenario. I would be in the course and scope of employment. I don't believe in this scenario, that the port is some kind of magic line. Mr. Middleton's relationship vis-a-vis Ports America did not change at the time he crossed through that gate.  Yes, but those restrictions are placed by the Georgia Ports Authority who owns and operates the port. Ports America does not impose those restrictions. Those are the Ports Authority's restrictions. So nothing changed about his relationship with Ports America at the time he crossed that line. He's still driving to report for work and to do the things that he's supposed to do. And he never did them. It seems like there are three, maybe there are more, but it seems like maybe there are three physical or conceptual lines. One is entry to the port possible. Two is when the union hall says you're with Ports America today. And the third, yours is as soon as you, I think it's not complete, but begin the completion of the first task. Are those the three possible lines? Are there any others? Well, I mean, the most, if we think of it, think of it as a continuum. You know, you could say at this end of the continuum is when he boards the ship. And, you know, he's put on the payroll and they begin cargo operations. I mean, that's going further. The three tasks don't even count, but not even you are contending for that. I'm saying that I will concede that even if he had gotten to one of those tasks, that it could be a jury question. I don't think that we have to push it that far. But I do, but again, I keep coming back to this. He didn't do any of them and he was on his way. So I think you have sort of like resisted Judge Abudu's proposed line when he enters the port. I understand what your line is. Sorry, I understand what your line is when he starts the first task. What about the other line when he leaves the union hall knowing that he's going to work for Ports America today and that Ports America either itself or as part of the common law describes these three things? Yeah, so I would point you to the Roper case that we cite in our brief. It's a Georgia Court of Appeals case from 2014, I believe. And, you know, the facts in Roper is you had an employee who was driving to get his assignments for the day. Kind of in a similar situation here. And he was in a car accident at the time. There was no evidence he was doing anything else that was separate from the commute itself. And the Court of Appeals held summary judgment. No fact question. As a matter of law, he was not in the course and scope of his employment. And that's where the rule comes from. The court said merely driving to fulfill your duty to show up to work on time is not an act in the course and scope of employment. Let me ask you something else. Isn't there a time period of one hour or something like that within which I guess between when they get their assignments and when they complete all three tasks or I guess when they have to do all of those three things? Isn't that a requirement also? I'm sorry, I'm not sure I understand your question. If there's a one hour time limit from when you pick up your or from when you get your assignment at the Union Hall to when you complete the three tasks. Yes, there's generally a one hour. The shape up meeting where they get their assignments generally occurs one hour before the cargo operations are to begin at the time you board the ship. Mr. Middleton testified during that time, I'm free to do what I want so long as I show up for work at one. He said, I can go to McDonald's on my way from the Union Hall to the port if I want to. We can look at his actions themselves once he was on the grounds of the port. He didn't drive to where his ship was located. He drove down to the end. But again, that's a jury question. We've already talked about that, right? But I think what gets around that jury question is the fact that he didn't complete any of the tasks. I'm sorry to interrupt. I just want to make sure I'm understanding because I think this is a tricky case. If you drive to the McDonald's, it's not on the port property. It's not in the port. You don't need special access or permission to be able to go to the McDonald's. It does seem like there's something special about going into the port at the very least. Whether or not you would start the line when the person leaves the Union Hall, I don't know whether we need to decide that. But it does seem like there's something special about getting to the port. It has to be within that hour or else you're not going to be allowed in the port. You have to have employment with a company. You have to be on the way into the port so that you can finish those three tasks within the hour. I mean, that does seem different than just driving around to some McDonald's or something. Well, let me point out one thing just to make sure I'm clear about this. Even Mr. Hicks is not proposing that the line starts at the time he leaves the Union Hall. I understand. I understand. So, there is nothing that I'm aware of in the case law to suggest that the course and scope of an employee's work for their employer starts just because they get on property. Whether that's restricted property, whether it's unrestricted property, whether it's a Chick-fil-A employee hitting someone in the parking lot as they're parking to report for duty. There's nothing in the law that says that that boundary is a magic line. Except that a Chick-fil-A employee hitting someone in the parking lot can go into the parking lot without being a Chick-fil-A employee. True. I mean, it does seem like there's something substantively different about the fact that you can get into the port only if you are employed for that day and have to, within that hour, finish all of these tasks. Again, Your Honor, I don't think there's anything in the law that creates that line. I think when you look at course and scope and when you look at the cases that talk about course and scope, what they focus on is what was the employee doing at the time of the tort. And at the time of the tort, he must have been doing something that served his master's business or was in the course and scope. And Georgia law says that merely driving, merely commuting, is not sufficient to meet that standard. All right. Thank you very much, counsel. Mr. Ramachandrappa, we'll hear from you. You've got five minutes left. So my co-counsel, he wrote down the question, why does he have to complete the task? I think it's the same question that Judge Newsom asked, and the answer is it doesn't. There's nothing... But in fairness, I think opposing counsel is arguing that he has to at least start the task. He had started it because Mr. Milton was going to get the game plans, and the driving to get them is part of the task. It's not just having them. It's having to go get them and then to take them to the vessel. And that is the start of the task. He's not in Florida when he starts this task. He is well within the port itself. And even the hypothetical that opposing counsel has given about parking in a deck in his law firm and hitting somebody, that on its own, that's not this case. The more realistic and more fitting example would be if Mr. Freed's, one of his partners had said, hey, I need you to go get this deposition transcript that's in the car, in my car in the garage, and on his way to get it, he hits somebody. That's what we have here. He's not just driving to park so then he can go on the ship. He's driving to get his game plans. And as Your Honor, Judge Rosenbaum pointed out, there is a fact dispute about whether he was going to the right place or not. In his mind, he believed that the Hyundai loyalty was at CV7, 8, or 9, and that's why he was there. One difference between the tweaked hypothetical that you just gave, though, in this case, is that here there's no analog to the partner saying, go get the deposition. No one with Courts America ever said, as far as I understand, go get the game plan. Well, no. I think this kind of goes back to your question about whether it's part of the custom or whether it's an explicit requirement. We certainly think, and that's the part of the 30B6 that I'm pointing to, where the representative says that's his whole job. He gets the paperwork and he knows the layout of the hatch. That is an express requirement, in our view, from Courts America. But even if it's not, even if it's just mere custom, it's clear custom. Nobody is disputing that. You can go on the port today and everybody will know these are the three things you have to do. And that's all that's required for it to be within the scope and to be furthering the business. You don't have to put it in writing in order for that to be the case. Even if we tweak my hypothetical one more time, which is that this partner, one of the partners of my law firm, never reads anything on a tablet. He only reads printed, hard copy transcripts. If the associate on that case knows and has done that for 10 years, I've got to go into his car, I've got to get it, I've got to get this transcript, and they hit somebody on the way, that's something more than just merely the commute. And it's not the completion of the task, it's the start of it. And honestly, I'm not even sure how we would really define start, but certainly that's the case there. And one more hypothetical, because this case really calls out for them. If you're a driver, and I have another case in Florida, where somebody was hired from a Tampa dealership to pick up a car in Atlanta, like a really expensive truck. The guy was hired, he hit somebody on the way to go and pick up that truck. He hasn't picked up the truck yet, he hasn't completed the task. In that case, the defendant didn't even contest a vicarious liability, because everybody understands that. And that's the same thing here. We have someone driving to go get the game plans. That is the task, driving to get them, not just having them. And so he's already started. And so I think under those set of facts and arguments we made, that this case is easily resolved, in the sense that it's a question for the jury, under Prodigy's Chauber v. Cotton. We have briefed and argued these other positions, which is that the commute ended once you're inside the port, because of all these limitations that exist, including that you have to be serving the business when you're on the port. And the hypothetical that was given to counter that, or the sort of argument, was, well, Mr. Middleton could have left and gone to McDonald's. He wasn't under some sort of lockdown order. Well, okay then. Under those facts, we would have a different case. But he wasn't doing that. He wasn't driving to a McDonald's. He hadn't left the ports. Those were none of the things that he had to do. So the concern that I have about my own, perhaps, proposal about the commute ending at the port, is perhaps that now opens the employer up to any illegal and lawful, perhaps, behavior, assaulting someone. I mean, what restrictions, and maybe I should have asked the other side, what restrictions make sense for the proposition that the commute would end at the port? I mean, if he enters in and decides he wants to assault someone, or he gets drunk while he's at the port, and then engages in unlawful behavior, that, I could understand, might be a little too far. Right. So as I've indicated, we don't have to go that far at all because of the facts. But the restrictions, I think, are sort of implicit. And you still have to apply the scope and furtherance of the business. If you get drunk, if you assault someone, you've gone past the scope of your business, and you're not in furtherance of it. It's sort of like what your friend on the other side of the aisle was arguing, which I kept saying, isn't that a jury question? That he had gone on this sort of jaunt to have lunch or whatever in this different place, and that he wasn't actually looking for the game plan, so if we had had, if the jury reaches that conclusion, then you would agree that he was not acting in the scope, right? Correct. Yeah, I mean, the answer to these questions is that the commuter rule, the idea that the commuter rule doesn't apply, doesn't automatically mean that that person's liable, or even within the scope. It just means that you can't rely on the mere fact that the commute existed. You still have to show the other requirements within the scope and furtherance of the business. All right. Thank you, counsel. We'll be in recess for the day, and we'll be back tomorrow.